## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Rex A. Hayes,                                        Civil No. 04-2907 (MJD/SRN)

       Plaintiff,

       v.                                        <u>REPORT AND RECOMMENDATION</u>

Jo Anne B. Barnhart,
Commissioner of Social Security,

       Defendant.

_____

Edward C. Olson, Esq., on behalf of Plaintiff

Lonnie F. Bryan, Assistant United States Attorney, on behalf of Defendant

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g) (2000), Plaintiff seeks judicial review of the final decision of the  Commissioner of Social Security (Commissioner), who determined that Plaintiff was not statutorily disabled and therefore not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § § 416(i), 423.

      The parties have submitted cross motions for summary judgment (See Doc. Nos. 8, 15).  The matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c).

      For the reasons set forth below, this Court recommends that Plaintiff's Motion for Summary Judgment (Doc. No. 8) be denied, and Defendant's Motion for Summary Judgment (Doc. No. 15) be granted.

## I.      BACKGROUND

### A.      <u>Procedural History</u>

On August 31, 2002, Plaintiff filed an application for disability insurance benefits stating that he became disabled on May 10, 2000.[1]  (R. at 118.)  The Social Security Administration denied Plaintiff's initial application on September 27, 2002 (<u>Id.</u> at 92) and upon reconsideration on December 27, 2002 (<u>Id.</u> at 99).  On January 27, 2003, Plaintiff timely filed a request for a hearing before an Administrative Law Judge (ALJ).  (<u>Id.</u> at 102.)  On July 16, 2003, Plaintiff appeared personally and testified before ALJ Paul D. Tierney.  (<u>Id.</u> at 21, 32.)  At the hearing, Plaintiff was represented by attorney Harold Sadoff.  (<u>Id.</u>. at 21.)  Wayne Onken appeared and testified as the government appointed Vocational Expert (VE).  (<u>Id.</u>)  Following the hearing, the ALJ kept the record open for purposes of receiving a residual functional capacity assessment from Plaintiff's treating physician.  (<u>Id.</u> at 84.)  On January 6, 2004, the ALJ issued his decision in which he determined that Plaintiff was not statutorily disabled.  (<u>Id.</u> at 22, 30, 31.)  Plaintiff then requested review of the ALJ's decision and that request was denied by the Social Security Appeals Council (Appeals Council) on April 7, 2004.  (<u>Id.</u> at 9.).  Upon denial of request for review by the Appeals Council, the ALJ's decision became the final decision of the Commissioner of Social Security and subject to judicial review.  (<u>Id.</u> at 11); <u>see also</u> 42 U.S.C. § 405(g).

Plaintiff now seeks review of the ALJ's decision.  Plaintiff requests summary judgment in his

---

[1] Plaintiff does not dispute that he worked up until June 6, 2001 (Pl.'s Mem. at 3, 6), consequently, the Court deems Plaintiff's application to allege an onset date on or shortly after June 6, 2001.

favor, specifically requesting that the Court reverse the Commissioner's decision and award benefits or

remand the decision for further review.  Defendant moves for summary judgment affirming the ALJ's

decision.

### B.   <u>Factual Background</u>

Plaintiff was forty years old on the date of his alleged disability, June 6, 2001, and forty-two

years old at the time of his hearing before the ALJ.  (<u>See id.</u> at 118.)  He has obtained a high school

diploma.  (<u>Id.</u> at 133.)  Between 1980 and 1986, Plaintiff worked as an assembler of circuit boards

and, from 1987 through 2001, Plaintiff worked as a machine operator in wood and metal fabrication

businesses.  (Id. at 160.)

Plaintiff had back surgery to correct a disc herniation on August 17, 2000.  (<u>Id.</u> at 175.)  He

also underwent surgery to repair his left rotator cuff on October 26, 2000.  (<u>Id.</u> at 187.)  Both surgeries

were performed by Dr. Kurt Anderson.  (<u>Id.</u> at 175, 187.)  Following the surgeries, Dr. Anderson

recommended that Plaintiff return to his work as a machinist but restricted him to waist-level work with

a maximum lifting and carrying weight of ten pounds and with no reaching or lifting with his left arm.

(<u>Id.</u> at 183.)  Plaintiff returned to work.  By February 2001, Dr. Anderson noted improvement in

Plaintiff's condition and modified Plaintiff's restrictions so that Plaintiff could work full-time as long as

he was limited to lifting or carrying nothing greater than twenty-five pounds and engaged in no repetitive

overhead work with his left arm.  (<u>Id.</u> at 188-97.)  By May 2001, however, Plaintiff claimed he

experienced pain after four hours of work under Dr. Anderson's restrictions and asked to be

reevaluated.  (<u>Id.</u> at 220-21.)  As a result of Plaintiff's pain complaint, the examining doctor, Dr. Robin

Fischer, put Plaintiff on a four-hour work restriction.  (<u>Id.</u> at 221.)  By June 2001, Plaintiff reported that

he could not even work four hours due to the pain and his treating physician, Dr. Luther Philaya took

him off all work and referred Plaintiff to a specialist.  (Id. at 219-20.)

On August 1, 2001, Plaintiff was seen by Dr. James Ogilvie, an orthopedic spine surgeon, who

concluded that Plaintiff had multilevel degenerative disc disease.  (Id. at 261.)  Plaintiff reported to Dr.

Ogilvie that he had extreme unrelenting back pain.  (Id. at 261.)  Dr. Ogilvie released Plaintiff to work

with the following restrictions: "no lifting more than 10 lbs., no repetitive rotating or bending.  He will be

allowed to sit or stand and changes position as needed with no real time limit."  (Id. at 260.)

In September 2001, as part of his ongoing efforts to find work within his medical restrictions,

Plaintiff underwent a battery of vocational tests.  (Id. at 505.)  These tests showed that Plaintiff had

poor long term memory retention and recall and was unable to perform intermediate level mathematical

calculations.  (Id. at 508.)  Also in September 2001, Plaintiff applied for a security job and received a

job offer.  (Id. at 499-500.)  The worker compensation insurance carrier for Plaintiff's employer,

however, rejected the security job.  (Id.)  A qualified rehabilitation consultant working with Plaintiff

during the relevant time period indicated that the insurance carrier rejected the security position because

"there was no specific number of hours identified by the employer and therefore, the adjuster at the

time, Michelle Skrede did indicate that she felt the job was not appropriate based on salary and hours

and [Plaintiff] was instructed to turn down the position."  (Id. at 419, 524-25.)  Plaintiff indicates he

was told to turn down the job because the insurance company told him that he "could not take [the job]

because of the risk involved of possibly hurting [him]self again trying to stop somebody from stealing

something." (Id. at 41.)[2]

Dr. Ogilvie noted in Plaintiff's medical record that "[w]e have discussed activity limitations being sedentary and possibly part time.  If [Plaintiff] is unable to have adequate capacity either on or off the job, at his current status, he would then return and discuss surgical options." (Id. at 259.)  By December 2001, Dr. Ogilvie noted that Plaintiff should "be seen by [a doctor] at Fairview Pain Management Center, for [a] chronic pain management evaluation.  If he is to return to any kind of employment activities, it would have to be sedentary in nature. . . . He should not attempt to work until [a pain specialist] has evaluated him." (Id. at 258.)

In March 2002, Plaintiff was seen by a pain management specialist at the Sister Kenny Chronic Pain Program, Dr. Matthew Monsein.  (Id. at 233-35.)  At that time, Dr. Monsein agreed with Dr. Ogilvie that Plaintiff would be limited to very light or sedentary work.  (Id. at 235.)  After a functional capacities evaluation in April 2002, Dr. Monsein opined that Plaintiff had the capacity to lift and carry five to fourteen pounds occasionally and up to five pounds frequently, sit for four to six hours in an eight-hour work day, and walk one to three hours in an eight-hour work day assuming Plaintiff was able to make frequent position changes.  (Id. at 281.)  Dr. Monsein also indicated that any other restrictions "need[ed] to be reviewed by Dr. Ogilvie." (Id. at 282.)  Dr. Monsein concluded that the April 2002 assessment showed Plaintiff was "an individual who is only able at this time to do light to sedentary activities." (Id. at 276.)

Following his pain management program with Dr. Monsein, Plaintiff was again seen by Dr.

---

[2] The record does indicate that searches for security work for Plaintiff after September 2001 were limited to "security positions that would be non-combative in nature." (Id. at 494.)

Ogilvie in May 2002. Dr. Ogilvie indicated that he "did make out a back to work form [for Plaintiff], indicating that there is no medical contraindication to him trying sedentary employment." (Id. at 257.) Dr. Ogilvie stated that "it is not clear that such employment, with the restrictions necessary, are [sic] available to him." (Id.)

In September 2002, two state agency physicians, Dr. Dan Larson and Dr. Harvey Aaron, reviewed Plaintiff's medical records. (Id. at 245-54.) Based upon the medical reports of Drs. Anderson, Monsein, and Ogilvie, Drs. Larson and Aaron concluded that Plaintiff could lift and/or carry a maximum of ten pounds frequently or occasionally, could stand and/or walk with normal breaks at least two hours in an eight-hour workday, could sit with normal breaks for a total of about six hours in an eight-hour workday, and had unlimited ability to push and/or pull (including the operation of hand and/or foot controls) within the above weight restrictions. (Id. at 246.)

In October 2002, Dr. Ogilvie again saw Plaintiff and concluded that Plaintiff received "no useful adjuncts and certainly no attempt at long-term management of his pain" during his treatment at the Sister Kenny Chronic Pain Program. (Id. at 256.) Dr. Ogilvie opined:

> It is my professional opinion that he is permanently and totally disabled from gainful employment. Any activity and any stationary position generates symptoms, which make him virtually unemployable. He takes 70 Vicodin per month and has agreed not to take more than that. From this standpoint, using the Vicodin is much safer medically and more clearly indicated than extensive lumbar surgery procedures. . . . I am not aware of any employment that I think he would be able to predictably sustain over a prolonged period of time.

(Id. at 256; see also id. at 442.)

Then, in December 2002, Plaintiff was independently re-evaluated by Dr. Jack Drogt in connection with Plaintiff's worker compensation claim. (Id. at 412-18.) Dr. Drogt had previously

evaluated Plaintiff in February 2001.  (Id. at 412-13.)  Plaintiff reported low back pain and appeared to

be uncomfortable generally but "had no pain or weakness on resisted abduction or resisted external

rotation. . . . did not have a painful arc of motion and had no signs of instability."  (Id. at 414.)  Dr.

Drogt also indicated that Plaintiff "was able to heel walk and toe walk.  He could bend forward 45

degrees, extend his back to 0 degrees and side bends 15 degrees."  (Id.)  Dr. Drogt indicated Plaintiff

did have musculature tightness indicating an active spasm.  Dr. Drogt disagreed with Dr. Ogilvie's

opinion that Plaintiff was totally and permanently disabled.  (Id. at 417.)  He instead opined that Plaintiff

was "capable of clerical and sedentary work" with "a five to ten pound lift-and-carry restriction on a

very limited  basis" as articulated by Dr. Monsein in his April 2002 functional capacities evaluation.  (Id.

at 418.)  Dr. Drogt indicated that he thought that the use of seventy Vicodin per month was "not

sustainable" and "preclude[d] his ability to return to work in a reasonable, safe manner" and, thus,

recommended that a competent, qualified pain management physician review Plaintiff's narcotic use.

(Id. at 417.)

     In May 2003, Plaintiff was evaluated by pain clinic nurse, Rhonda Thompson, following a

referral from Dr. Ogilvie.  (Id. at 406-11.)  Nurse Thompson indicated that Plaintiff "should be able to

return to work at a sedimentary [sic] job at least four hours per day."  (Id. at 410.)  She also noted that

"the patient has very, very well-developed forearm and upper arm musculature and lower extremity

musculature, which is inconsistent with both self-reported and reported by his wife the patient sending

[sic] up to 20 hours per day in bed due to pain and inability to function due to pain."  (Id. at 411.)

Further, Nurse Thompson indicated that, "the patient stated that his shoulders and upper neck were

sore because he has been working and cleaning out in his garage."  (Id.)

C.       **Hearing Testimony**

1.       **Testimony of Plaintiff**

At the July 16, 2003 administrative hearing, Plaintiff testified that his alleged disability limited his ability to function in a number of ways.  Plaintiff stated that he did drive a motor vehicle a couple of times per week for short distances, but that he would need to stop and take a break from driving once or twice during a trip lasting an hour and twenty minutes.  (Id. at 38, 50.)  After the date of the onset of his alleged disability, Plaintiff testified that he continued to apply for work within a fifty-mile radius of his residence that met the requirements of his medical restrictions.  (Id. at 40-42.)

In September 2001, as part of ongoing efforts to find suitable work for Plaintiff in connection with his worker compensation insurance claim, Plaintiff received a full-time job offer from ITS Security Company to work at a security position in Elk River, Minnesota.  (Id. at 419, 499.)  Plaintiff testified that he "was hired."  (Id. at 69.)  At the administrative hearing, Plaintiff testified that the security company was aware of his contemporary work restrictions when the offer was extended.  (Id. at 42.)  Plaintiff testified that he was prepared to accept the job and already had his security uniform when he was told by his employer's worker compensation insurance carrier that he could not take the job, according to Plaintiff, "because of the risk involved of possibly hurting [himself] again trying to stop somebody from stealing something."  (Id. at 41.)  The ALJ and Plaintiff had the following exchange about the security job:

ALJ:          But you didn't get any objection from [the security employer}?
Plaintiff:     No. . . . They just had a lead person that I had to contact and they just told me to show them what my restrictions are, and they probably wouldn't have a problem with it.
ALJ:          What were the restrictions that you told them about?

| Plaintiff: | No lifting and bending.  No twisting.  I think the weight restriction was like 10, 5 to 10 pounds of lifting and that was off a table.  Standing, sitting, variable positions. |
| ALJ: | Was that a full time job at [the security employer]? |
| Plaintiff: | Yes, it was. |
| ALJ: | So if it hadn't been for the Worker's Comp insurance company interfering you might be working at [the security company] right now? |
| Plaintiff: | That's right.  I was set to start the following week on the Monday or Tuesday, I can't remember what it was.  I was all set, I had security shirts that said security on them in my hand when I walked out the door, and everything (INAUDIBLE) the first day.  I had to get approval from the insurance company. |

(Id. at 42.)

Plaintiff also gave testimony concerning the effects of the pain medication he uses.  Plaintiff testified that he takes Vicodin pain medication two to three times a day, that the medication makes him sleepy, but that he is still able to drive while on the medication.  (Id. at 44.)  Plaintiff also takes Flexeril, a muscle relaxer, at nighttime.  (Id. at 53.)  Plaintiff stated that he does not use a cane or other device to walk, could stand for about an hour, walk about half an hour, and sit for about an hour at a time.  (Id. at 45.)  He testified that he could lift about five pounds from table height and grip items with his fingers and hands but could not bend very much at the waist and could not kneel down.  (Id.)  Plaintiff explained that his activities include picking up one of his children from school a couple of days a week, preparing breakfast and lunch, cleaning and grooming himself, getting dressed, watching television, occasionally mowing the lawn for up to twenty minutes with a riding lawn mower, occasionally going out to a restaurant, and occasionally visiting friends.  (Id. at 46-50, 68.)  Plaintiff testified that he does not: shovel snow, lift grocery bags, put away groceries, wash laundry, fold clothes, iron, do repairs, wash dishes, straighten up, dust, vacuum, mop the floor, clean the bathroom, make the bed, or change the bed sheets.  (Id. at 66-69.)

Plaintiff described his pain as a constant 7 on a 1-10 pain scale.  (Id. at 66.)  He testified the pain causes him to awaken a couple of times per night.  (Id. at 54-56.)  He also testified that he is in constant pain that is only alleviated by lying down.  (Id. at 62-66.)  In addition, Plaintiff stated that he takes Paxil once a day for depression.  (Id. at 52.)  The Paxil causes drowsiness.  (Id. at 53.)  Finally, Plaintiff has been prescribed medications such as Bupropion and Percodan for relief of pain (Id. at 257) and Vioxx as an anti-inflammatory agent (Id. at 262), among other medications.

### 2. Testimony of the Vocational Expert

The VE testified that Plaintiff could not perform his past relevant work given his physical limitations.  (Id. at 73.)  The ALJ then asked the VE to:

> assume that [Plaintiff] can lift 10 pounds occasionally, less than 10 pounds frequently, stand or walk a total of 2 hours in an 8-hour day.  He can sit a total of 6 hours in an 8-hour day. He needs a sit/stand option. . . . I'd like you to assume that he could not raise—do any work with his left arm above his . . . shoulder.  Considering his age, his education, and his past work experience, would there be other jobs in the regional or national economy that such a person could do in your opinion?

(Id. at 74.)  The VE responded that there would be 1,000 gate guard jobs (classified as semiskilled and sedentary), 1,500 surveillance system monitor jobs (classified as unskilled and sedentary), and 1,500 cashier positions (classified as unskilled and sedentary) in Minnesota that such a person could perform. (Id. at 74-75.)  The ALJ also asked the VE how many jobs would remain if the hypothetical person had problems concentrating and could only perform simple, repetitive activities.  (Id. at 75.)  The VE responded that such a person could perform the same 4,000 gate guard, surveillance system, and cashier jobs.  (See id.)

Plaintiff's counsel then asked the VE if the gate guard jobs enumerated could be performed if

the hypothetical person could only lift five pounds and only from table height.  (Id. at 78.)  The VE

indicated that such a person could work a gate guard job "because the job, in essence, does not involve

any lifting" or twisting or bending and the gate jobs the VE had in mind used electronic, not manual,

gates.  (Id.)  Plaintiff's counsel also asked how many of the 4,000 jobs enumerated by the VE would

remain if the hypothetical were changed as follows:

> [A]ssume [he] can not sit for more than an hour a day, and he has to get up, okay.  And
> I want you to assume he cannot stand for more than an hour a day, then he has to lie down
> to relieve the pain or sit down.  So that's the alternate standing and sitting. . . . If he does
> alternate standing and sitting on my assumption, he—would he not have more [than] 2
> hours of standing a day for the job that you're describing?

(Id. at 81.)  The VE responded that such a hypothetical person could not work any of the 4,000 jobs

identified.  (Id.)  Finally, Plaintiff's counsel asked the VE whether the cashier jobs could be performed

by someone with Plaintiff's mathematical skills.  (Id. at 82.)  The VE responded that the cashier jobs he

considered appropriate only made basic change, such as parking ramp attendants.  (Id.)

### 3.      Evidence Submitted Following the Administrative Hearing

At the close of the administrative hearing, the ALJ left the record open for two weeks so that

Plaintiff could submit a residual functional capacity assessment performed by Dr. Ogilvie.  (Id. at 84.)

On July 21, 2003, Dr. Ogilvie completed a medical opinion form entitled "Ability to Do Work-Related

Activities (Physical)," which addressed Plaintiff's physical abilities.  (Id. at 528.)  Dr. Ogilvie opined

that Plaintiff could lift and carry a maximum of ten pounds on an occasional basis, could lift and carry

less than ten pounds on a frequent basis, could stand and walk (with normal breaks) less than two hours

during an eight-hour day, and could sit (with normal breaks) a maximum of four hours during an eight-

hour day.  (Id.)  Dr. Ogilvie also reported that Plaintiff needed to: shift positions after an hour of sitting,

11

shift positions after a half-hour of standing, "walk around" every forty-five minutes for ten minutes at a

time, and have the ability to shift "at will" from sitting or standing/walking.  (<u>Id.</u> at 529.)  Finally, Dr.

Ogilvie opined that Plaintiff needed to "lie down at unpredictable intervals during a work shift" one to

two times daily (<u>Id.</u>) and indicated that "on average" Plaintiff would be absent from work more than

three times per month due to his impairments or treatment.  (<u>Id.</u> at 531.)  Dr. Ogilvie stated his medical

basis for the above findings was "multiple level lumbar disc disease."  (<u>Id.</u> at 529.)  No other

explanation was provided.

## II.      STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be

awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer

from a physical or mental disability."  <u>Locher v. Sullivan</u>, 968 F.2d 725, 727 (8th Cir. 1992).

"Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A)

(2000).  The claimant's impairments must be "of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423 (d)(2)(A).

The impairment must have lasted or be expected to last for a continuous period of at least twelve

months or be expected to result in death.  42 U.S.C. § 423 (d)(1)(A)

### A.      <u>Administrative Review</u>

If a claimant's initial application for benefits is denied, he or she may request reconsideration of

the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the

reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. § 405(b)(1), 42 U.S.C.

§ 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq.  If the claimant is dissatisfied with the

ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.

20 C.F.R. §§ 404.967-404.982, 416.1467-416.1482.  The decision of the Appeals Council (or of the

ALJ if the request for review is denied) is final and binding upon the claimant unless the matter is

appealed to a federal district court within sixty days after notice of the Appeals Council's action.  42

U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### B.   Judicial Review

The Court's review is limited to a determination of whether the decision of the ALJ is supported

by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Ramirez v. Barnhart, 292 F.3d

576, 583 (8th Cir. 2002).  "Substantial evidence is less than a preponderance, but enough so that a

reasonable mind might find it adequate to support the conclusion."  Johnson v. Apfel, 240 F.3d 1145,

1147 (8th Cir. 2001).  But "[t]he substantial evidence test employed in reviewing administrative findings

is more than a mere search of the record for evidence supporting the [Commissioner's] findings."

Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a

whole,' . . . requires a more scrutinizing analysis."  Id. (quoting Smith v. Heckler, 735 F.2d 312, 315

(8th Cir. 1984)).  In reviewing the administrative decision, "'[t]he substantiality of evidence must take

into account whatever in the record fairly detracts from its weight.'"  Id. (quoting Universal Camera

Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment

or findings of fact.  Harwood v. Apfel, 186 F.3d 1039, 1042 (8th Cir. 1999).  The possibility that the

court could draw two inconsistent conclusions from the same record does not prevent a particular

finding from being supported by substantial evidence.  <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th

Cir. 1994).  The Court should not reverse the Commissioner's finding merely because evidence may

exist to support the opposite conclusion.  <u>Mitchell v. Shalala</u>, 25 F.3d 712, 714 (8th Cir. 1994).    In

general, the claimant bears the burden of proving his or her entitlement to disability insurance benefits

under the Social Security Act.  20 C.F.R. §§ 404.1512(a), 416.912(a); <u>Thomas v. Sullivan</u>, 928 F.2d

255, 260 (8th Cir. 1991).

 The reviewing court must consider both evidence that supports and evidence that detracts from

the Commissioner's decision.  <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998).  The Court is

required to review the administrative record and to consider:

 1. The credibility findings made by the ALJ.

 2. The Plaintiff's vocational factors.

 3. The medical evidence from treating and consulting physicians.

 4. The Plaintiff's subjective complaints relating to exceptional and non-exertional activities and impairments.

 5. Any corroboration by third parties of the Plaintiff's impairments.

 6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the Plaintiff's impairments.

<u>Cruse v. Bowen</u>, 867 F.2d 1183, 1185 (8th Cir. 1989) (<u>citing</u> <u>Brand v. Secretary of HEW</u>, 623 F.2d

523, 527 (8th Cir. 1980)).

 Pursuant to the Social Security Act, the Secretary of Health and Human Services

promulgated a five-step analysis to be followed by the ALJ in determining whether a claimant is

disabled:

> 1.  Has the claimant engaged in substantial gainful activity since the alleged onset disability?
>
> 2.  Is the claimant suffering from a severe impairment?
>
> 3.  Does the claimant's impairment meet or equal the Listing of Impairments set forth by the Social Security Administration in the code of federal regulations.
>
> 4.  Does the claimant have the residual functional capacity (RFC) to perform the claimant's past relevant work?
>
> 5.  If the claimant is unable to perform past relevant work, is there any other work in the national economy that the claimant can perform?

20 C.F.R. § 416.920(b)-(f); Bowen v. Yuckert, 482 U.S. 137 (1987).

## III.   DECISION OF THE ADMINISTRATIVE LAW JUDGE

Here, the ALJ followed the five steps enumerated above.  The ALJ found that Plaintiff had not

engaged in substantial gainful activity since June 6, 2001, that Plaintiff was severely impaired by

degenerative disc disease of the lumbar spine and by rotator cuff damage, but that Plaintiff's limitations

did not meet or equal the criteria set forth in any impairment listed by the Social Security

Administration.  (R. at 22.)  The ALJ also acknowledged that Plaintiff was being treated for depression

but found that Plaintiff's depression was a non-severe impairment.  (Id. at 23.)  Finally, the ALJ found

no evidence that Plaintiff had any functional limitation due to cognitive impairment.  (Id.)

In considering Plaintiff's subjective claims of physical limitations due to his back and shoulder

impairments, the ALJ applied the factors set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir.

1984), and the applicable Social Security regulations.  (R. at 23.)  The ALJ found that many of

Plaintiff's subjective complaints were consistent with the objective medical evidence and that Plaintiff

was limited to some degree.  (Id. at 23.)  The ALJ indicated that his determination of Plaintiff's residual

functional capacity incorporated these limitations.  (Id.)  But, after considering both objective medical

evidence and after finding inconsistencies in the subjective evidence, the ALJ disagreed with Plaintiff's

contention that Plaintiff was incapable of performing any work.  (Id. at 24, 28-29.)  The ALJ noted that

Plaintiff mowed grass, did not always comply with medical advice, used pain medication inconsistently,

received worker compensation payments which provided an incentive not to work, and did not

complain of any significant pain medication side effects which would affect his ability to work.  (Id. at

28-29.)

Nonetheless, the ALJ found that Plaintiff could not perform his past relevant work.  (Id. at 30.)

The ALJ then turned his attention to determining whether Plaintiff could perform a significant number of

jobs in the national economy.  (Id.)  In assessing the objective evidence, the ALJ gave great weight to

the impartial VE's testimony.  (Id. at 30.)  The ALJ granted considerable weight to the opinions of Dr.

Monsein, Dr. Drogt, and a pain clinic nurse.  (Id. at 24-25.)  He also gave considerable weight to the

state agency physicians' assessment of Plaintiff's capacity because their opinions were consistent with

Dr. Monsein and Dr. Drogt, a pain clinic nurse, and portions of Dr. Ogilvie's opinions.  (Id. at 25.)

The ALJ, however, discounted the opinions, at least in part, of two of Plaintiff's treating

physicians, Dr. Ogilvie and Dr. Philaya.  (Id. at 24-25.)  The ALJ discounted Drs. Philaya's and

Fischer's opinions because the ALJ concluded that these opinions were meant to apply on a

temporary, not permanent, basis.  (Id. at 25.)  The ALJ adopted the portion of Dr. Ogilvie's July 21,

2003 assessment of Plaintiff in which Dr. Ogilvie concluded that Plaintiff was able to lift and carry ten pounds on an occasional basis, lift and carry less than ten pounds frequently, stand less than two hours in an eight-hour day in thirty minute increments, walk less than two hours in an eight hour day in forty-five minute increments, and needed the option of shifting at will from sitting or standing/walking.  (Id. at 24.)  But the ALJ rejected Dr. Ogilvie's July 21, 2003 assessment to the extent that the report indicated that Plaintiff was limited to sitting about four hours in an eight-hour day (which the ALJ found would limit Plaintiff to working a six-hour day) because the ALJ found no objective basis for such a conclusion.  (Id.)  The ALJ also rejected Dr. Ogilvie's opinion that Plaintiff needed to lie down at unpredictable intervals one to two times daily and that Plaintiff would be absent from work more than three times per month due to his impairments or treatment.

In sum, the ALJ found that the hypothetical posed to the VE at the administrative hearing was correct and supported by the opinions of Drs. Monsein and Drogt, a pain clinic nurse, and the state agency physicians Drs. Larson and Aaron (Id. at 24-25) and that Dr. Ogilvie's opinion went astray of these other medical opinions, did not provide an adequate medical basis for the more restrictive limitations found, and was inconsistent with Plaintiff's own self-described abilities (Id. at 24-30).

## IV.    DISCUSSION

"If the ALJ finds that the claimant cannot return to his past relevant work, the burden of proof shifts to the [Commissioner], who then has the duty to establish that the claimant is not disabled within the meaning of the Act."  Talbott v. Bowen, 821 F.2d 511, 514-15 (8th Cir. 1987).  The Commissioner must prove that the claimant retains the ability to do other kinds of work, and other work the claimant can perform exists in substantial numbers in the national economy.  Nevland v. Apfel, 204

F.3d 853, 857 (8th Cir. 2000).  Thus, the burden to show that Plaintiff could still perform work within

the national economy was on the Commissioner.  Here, Plaintiff advances two primary arguments in

support of reversing the ALJ's opinion below: (1) the ALJ improperly discounted the opinion of

Plaintiff's treating physician, Dr. Ogilvie; and (2) the ALJ failed to take into account Plaintiff's physical

and cognitive limitations when posing the hypothetical to the VE.  (Pl.'s Mem. at 7, 9.)  Each contention

is considered below.

### A.      Dr. Ogilvie's Opinion[3]

Significant portions of Dr. Ogilvie's opinion as to the functional abilities of Plaintiff are consistent

with the opinions of the other examining and record reviewing physicians.  But Dr. Ogilvie, unlike the

other medical professionals that examined or reviewed Plaintiff's medical records, found that Plaintiff

could sit (with normal breaks) only a maximum of four hours during an eight-hour day (R. at 528),

needed to "lie down at unpredictable intervals during a work shift" one to two times daily (Id. at 529),

and that "on average" Plaintiff would be absent from work more than three times per month due to his

impairments or treatment  (Id. at 531).  Plaintiff contends correctly that a treating physician's opinion

must be given appropriate deference and that the Commissioner may not "substitute [his] judgment for

the opinion of a treating source on the issue(s) of the nature and severity of an impairment when the

treating source has offered a medical opinion that is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other substantial evidence" (Pl.'s Mem. at

---

[3] While Plaintiff does not appear to contest the ALJ's discounting of Dr. Philaya's and Dr.
Fisher's opinions, for the record the Court finds that the ALJ correctly discounted these opinions as
they were intended to be temporary restrictions and not assessments of Plaintiff's permanent limitations.

18

8 (citing SSR 96.2p) (emphasis added)).

The Court finds that Dr. Ogilvie's opinion is not entitled to the normal deference due a treating physician given the record as a whole. First, the Court does not find Dr. Ogilvie's opinion, where it differs from that of the other examining and reviewing physicians' opinions, to be well-supported by clinical and/or laboratory diagnostic techniques. Indeed, the five-word basis provided by Dr. Ogilvie in support of his July 21, 2003 opinion was that Plaintiff had "multiple level lumbar disc disease" (R. at 529) a diagnosis shared or adopted by the other medical providers. As such, no explanation for Dr. Ogilvie's departure from the assessments of the other medical providers is evident in the record.

Second, the Court finds that the ALJ did not err when he found that Dr. Ogilvie's opinion was inconsistent with other substantial evidence in the record, for example, the opinions of Drs. Monsein and Drogt, a pain clinic nurse, and the state agency physicians Drs. Larson and Aaron. Further, Dr. Ogilvie's opinion that Plaintiff was disabled was internally inconsistent. In August 2001, Dr. Ogilvie found Plaintiff limited in ways similar to the opinions of the other medical providers. (Id. at 260.) In May 2002, Dr. Ogilvie stated that there was, "no medical contraindication to [Plaintiff] trying sedentary employment." (Id. at 256.)

Third, Dr. Ogilvie's opinion that Plaintiff could not work any jobs appears to based largely on his opinion about vocational factors. Where based upon vocational factors, a treating physician's opinion is not entitled to deference. See Turley v. Sullivan, 939 F.2d 524, 527 (8th Cir. 1991) (per curiam). By October 2002, Dr. Ogilvie reported that Plaintiff was "permanently and totally disabled from gainful employment" but also noted that Plaintiff was "virtually unemployable" due to "symptoms" generated by any activity and any stationary position. (R. at 256 (emphasis added.)) Dr. Ogilvie

19

stated, "I am not aware of any employment that I think he would be able to predictably sustain over a prolonged period of time."  (Id.)  Dr. Ogilvie's opinion as to Plaintiff's ability to work particular jobs is not one due deference.  Thus, the ALJ did not err in discounting such statements.

Fourth, Dr. Ogilvie's opinion is inconsistent with Plaintiff's own testimony concerning his abilities.  After Dr. Ogilvie's October 2002 report issued, Plaintiff testified that he still drove a motor vehicle on a regular basis, albeit for short durations of up to forty minutes at a time.  (See id. at 38, 50.) Plaintiff also reported that he continued to mow his lawn with a riding lawn mower, albeit for short durations of up to twenty minutes.  (Id. at 46.)  In May 2003, Plaintiff also told a pain clinic nurse that he had been cleaning out his garage.  (Id. at 411.)  Finally, while Plaintiff testified that he spent much of his day in bed, he did testify that he was able to clean and groom himself, prepare meals, visit friends and relatives, and eat out at restaurants.  (Id. at 38, 46-50, 58-59, 69.)

Given the above and the record as a whole, the Court does not find that the ALJ erred in discounting Dr. Ogilvie's opinion concerning Plaintiff's limitations.

**B.      The Hypothetical to the VE**

Plaintiff contends that the ALJ's hypothetical to the VE failed to accurately describe Plaintiff's physical and cognitive abilities.  After discounting Dr. Ogilvie's opinion, the ALJ concluded that Plaintiff was physically limited only to the extent set forth in the opinions of Drs. Monsein and Drogt, a pain clinic nurse, and the state agency physicians Drs. Larson and Aaron.  The ALJ also concluded that Plaintiff's ability to work was not impaired by Plaintiff's use of pain and other medications.  (Id. at 29.) Finally, the ALJ found no evidence that Plaintiff had a mental impairment.  (Id. at 23.)

The ALJ then asked the VE to:

assume that [Plaintiff] can lift 10 pounds occasionally, less than 10 pounds frequently, stand or walk a total of 2 hours in an 8-hour day.  He can sit a total of 6 hours in an 8-hour day.  He needs a sit/stand option. . . . I'd like you to assume that he could not raise—do any work with his left arm above his . . . shoulder.  Considering his age, his education, and his past work experience, would there be other jobs in the regional or national economy that such a person could do in your opinion?

(Id. at 74.)  The VE stated that 4,000 jobs existed in Minnesota at the time of the hearing that the hypothetical person could perform.  The Court finds that, after the inconsistent portions of Dr. Ogilvie's opinion are discounted, the ALJ's hypothetical is consistent with the medical record and with the record as a whole.  In addition, the specific positions the VE suggested Plaintiff could perform were all jobs classified as sedentary.  The Court finds that the ALJ did not err in finding that the Plaintiff could perform these sedentary jobs given Plaintiff's residual physical capacity.

Moreover, Plaintiff argues that the ALJ erred when he failed to take into account Plaintiff's cognitive abilities in posing the hypothetical to the VE.  (Pl.'s Mem. at 9-10.)  "A claimant's formal education is conclusive proof of his educational abilities under the [Social Security] regulations only if no other evidence is presented to contradict it."  Watson v. Sullivan, 956 F.2d 768, 771 (8th Cir. 1992).  While some evidence exists to show that Plaintiff's long-term memory, recall, and processing speed are poor, Plaintiff was capable of "perform[ing] basic addition, subtraction, multiplication, and division of whole numbers, [and] the ability to add and subtract simple fractions."  (R. at 508.)  Overall, the comprehensive vocational assessment indicated that Plaintiff could perform jobs such as an industrial order clerk and dental lab technician.  (Id. at 515.)  At the administrative hearing, the VE testified that he had reviewed the test results concerning Plaintiff's reading and math skills.  (Id. at 82.)  The VE also testified that the cashier positions he considered Plaintiff capable of performing were those that only

21

required the employee to make change.  (Id.)  The ALJ also asked the VE how many jobs would

remain if the hypothetical person had problems concentrating and could only perform simple, repetitive

activities.  (Id. at 75.)  The VE responded that such a person could perform the same 4,000 gate guard,

surveillance system, and cashier jobs.  (See id.)

        As further support that jobs exist in Minnesota which Plaintiff could perform, the Court notes

that there is no evidence that Plaintiff ever sought mental health treatment and was described by Dr.

Drogt in December 2002 as "alert, oriented, pleasant and cooperative."  (Id. at 414.)  Additionally,

Plaintiff sought and received a job offer for a security position after the onset date of his physical

impairments.  (Id. at 499-500.)  Plaintiff ultimately did not commence this employment either because

the hours were not specified (Id. at 419) or, according to Plaintiff, because of the possible risk of

physical injury (Id. at 41).  There is no indication, however, that Plaintiff did not start the job because of

any mental impairments, and Plaintiff himself testified that he was prepared to work at that job.  Finally,

at least 3,000 of these jobs were identified by the VE as unskilled work.  (Id. at 74-75.)  The Court

finds that the ALJ did not err in finding that Plaintiff's cognitive challenges did not alter his ability to

perform the cited jobs.  Further, the Court finds that any error the ALJ may have committed by failing

to incorporate Plaintiff's cognitive limitations into the hypothetical posed to the VE were harmless given

that there is no indication the jobs cited by the VE require cognitive skills beyond those possessed by

Plaintiff.

        Given the above, the Court does not find that the ALJ erred in either posing the subject

hypothetical or relying on the answers of the VE to that hypothetical.  The Court has reviewed all of

Plaintiff's objections to the ALJ's decision and finds that the ALJ did not err in anyway that requires

reversal or remand of his decision.

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 8) be **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 15) be **GRANTED.**

Dated: July 14, 2005

                    s/ Susan Richard Nelson
                SUSAN RICHARD NELSON
                United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by July 29, 2005, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.